## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **Criminal No.  JFM-09-00452** |
| **LENNY ORTIZ,** | : | |
| | : | |
| **Defendant** | | |
| | : | |

...o0o...

### GOVERNMENT'S RESPONSE
### TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

Now comes the United States of America by its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland and Christopher J. Romano, Assistant United States Attorney and responds in opposition to the Defendant's motion to suppress physical evidence.

**I.     FACTUAL AND PROCEDURAL SUMMARY OF THE CASE**

On August 18, 2009, a federal grand jury returned a two count indictment against Lenny Ortiz (Defendant), charging him in Count One with conspiracy to distribute more than 5 kilograms of cocaine, and in Count Two with possession with the intent to distribute more than 5 kilograms of cocaine.

On September 25, 2009,  the Defendant was arraigned and pled not guilty to both charges. On February 23, 2010, the Defendant filed a motion to suppress the physical evidence seized from the vehicle he was operating on August 7, 2009.

The Government opposes the Defendant's motion to suppress evidence and respectfully

requests that the motion be denied.

## II. STATEMENT OF FACTS

On August 7, 2008, at approximately 7:48 pm, Trooper First Class (TFC) Decker of the Maryland State Police was on routine patrol southbound on I-95 in Baltimore County, when he observed a white Mitsubishi SUV bearing NJ registration YSY 95E, traveling above the posted speed limit in a construction zone. The speed limit in the area was 55 mph and TFC Decker observed the vehicle traveling at a rate of 65 mph. There were two posted construction signs prior to Exit-67 advising of the posted speed.

After following the vehicle for approximately one quarter mile, TFC Decker initiated a traffic stop on the vehicle. TFC Decker's patrol car was equipped with a video camera which is activated upon TFC Decker activating his emergency equipment.[1] Upon approaching the vehicle, TFC Decker immediately detected an overbearing scent of air fresheners coming from within the vehicle. TFC Decker observed multiple air fresheners next to the driver, one hanging from the rear window, another hanging from the rear view mirror, and two unopened air fresheners in the glove box[2]. TFC Decker also observed only a single key in the ignition. TFC Decker informed the Defendant, who was the sole occupant of the vehicle, of the reason for making the traffic stop. In speaking with the Defendant, the Defendant told TFC Decker that he knew he was speeding but stated he saw TFC Decker behind him and he didn't want to slam on his brakes.

---

[1] There is both an audio and video record of the traffic stop. A copy of the video, which has previously been provided to defense counsel, will be submitted to the Court as Government Exhibit 1.

[2] TFC Decker observed the air fresheners in the glove box when the Defendant opened the glove box.

TFC Decker then asked the Defendant about his destination, and the Defendant advised TFC Decker he was going to meet a friend at a restaurant off Exit-59 or Exit-60. TFC Decker asked the Defendant how long he was staying in this area and the Defendant stated one or two nights. TFC Decker did not see any luggage that would suggest that the Defendant would be staying in Maryland for any time period consistent with the Defendant's statement. The Defendant produced his NY driver's license, but when TFC Decker asked him for the owner's information for the vehicle, which was displaying New Jersey tags, the Defendant stumbled over the owner's name, stating that he only knew the last name, which was Sanchez. The Defendant told TFC Decker that the owner (Sanchez) was a friend of his and he borrows the vehicle often.

TFC Decker returned to his vehicle and began to run a MVA check on the Defendant's license status. TFC Decker also requested a criminal history check on the Defendant. While TFC Decker was preparing to write a warning ticket for the Defendant, TFC Decker was joined by another trooper, TFC Gussoni. TFC Gussoni spoke with the Defendant. In speaking with TFC Gussoni, the Defendant stated he may be suspended in Virginia. TFC Gussoni informed TFC Decker of this and TFC Decker then requested a license check in Virginia for the Defendant as well. The Defendant also told TFC Gussoni that he was in no hurry and they could search the vehicle if they wanted.

The Defendant initially produced an insurance card for the vehicle which reflected that the insurance had expired. Subsequently, he produced documentation of valid insurance. TFC Decker and Gussoni were concerned that the vehicle may be stolen, as the Defendant could not provide information on the owner of the vehicle. Ultimately, the Defendant was given a warning ticket by TFC Decker for exceeding the posted speed and was told he was free to go. Upon handing the

3

warning ticket and registration and insurance information back to the Defendant, TFC Decker told the Defendant he was still concerned that the vehicle might be stolen and asked the Defendant to consent to a search for signs of tampering/theft. The Defendant then gave consent. TFC Decker and Gussoni then began a search of the vehicle and approximately two minutes later they discovered a hidden compartment ("trap") inside the vehicle. Upon discovering the trap, the Defendant was handcuffed and questioned about the hidden compartment and denied any knowledge about it. It took several more minutes for the officers to open the trap, which was done by the use of cable wires and the vehicle's battery. Once the trap was opened six (6) kilograms of cocaine were discovered inside the hidden compartment. The Defendant was then placed under arrest.

### III.     ARGUMENT:

**The Seizure Of The Drugs Was Lawful.**

*1.     The Initial Stop.*

As set forth *supra*, TFC Decker had a valid basis to stop the vehicle. A decision to stop an automobile is reasonable where a police officer has probable cause to believe a traffic violation has occurred, regardless of how minor the traffic offense may be. *Whren v. United States*, 517 U.S. 806, 810 (1996); *Delaware v. Prouse*, 440 U.S. 648, 659 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). *See also, Rusher*, 966 F.2d at 875-76 (state trooper's stop of automobile for two traffic violations, failure to wear seatbelt and faulty license plate, was proper); *United States v. Jeffus*, 22 F.3d 554 (4th Cir. 1994) (police officer's stop of vehicle with cracked windshield, broken taillight and headlight was justified); *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996) (state trooper's stop of vehicle with cracked windshield and traveling six miles over posted speed limit was valid). Therefore, the vehicle's excessive speed provided a legitimate basis for the stop.

### 2.    *Subsequent Detention/Investigatory Stop.*

In *United States v. Brugal*, 209 F.3d 353, (4th Cir. 2000) the Fourth Circuit held that the *Terry*[3] reasonable suspicion standard requires an officer to have a reasonable suspicion that criminal activity is afoot before he may conduct a brief investigatory stop of a person or to continue to seize a person following the conclusion of the purposes of a valid stop. TFC Decker had a reasonable suspicion for the continuation of the stop and for the questioning of the Defendant based on various factors. First, the vehicle operated by the Defendant was registered to an individual that the Defendant claimed was a friend, but did not know her name, other than her last name. Second, while the Defendant indicated that he was traveling to Maryland and planned to stay for one to two days, there was no luggage in the vehicle that would suggest a stay of that duration. Third, there was only a single key in the ignition and multiple air fresheners[4] throughout the vehicle. Fourth the Defendant was extremely nervous[5], in his encounter with both TFC Decker and TFC Gussoni.

In assessing whether an officer has a reasonable suspicion of criminal activity, the totality of the circumstances should be considered. *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir.

---

[3] *Terry v. Ohio,* 392 U.S. 1 (1968)

[4] Air fresheners are commonly used to mask the smell of narcotics. *United States v. Foreman*, 369 F.3d 776, 784-785 (4th Cir. 2004);*United States v. Foley*, 206 F.3d 802, 804, 806 (8th Cir. 2000).

[5] Both the Supreme Court in *United States v. Sokolow*, 490 U.S. 1 (1989) and the Fourth Circuit in *United States v. Alpert*, 816 F.2d 958, 961 (4th Cir. 1987) have held that reasonable suspicion that criminal activity may be afoot can be based on a number of factors including being nervous when addressed by a police officer. *See also, United States v. McFarley*, 991 F.2d 1188, (4th Cir. 1993) (police had reasonable suspicion to justify further questioning where defendant and companion passenger appeared unusually nervous and companion found it necessary to "check" with defendant before answering questions).

1997). Also, as noted in *Sokolow,* "[r]easonable suspicion is a commonsensical proposition," *Sokolow*, 490 U.S. at 9-10 (*quoting Terry*, 392 U.S. at 22) and courts are "not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the streets." *Id*. As such, reviewing courts should consider all of the facts available to the officers who made the stop, and should permit the officers to draw on their experience and training to make inferences and deductions about the "cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 544 U.S. 266, 273-74 (2002).

While the Defendant may argue that none of his actions up to this point were illegal (save for the traffic violations), and as such do not constitute a reasonable and articulable suspicion that he was engaged in criminal activity, his conduct cannot be viewed in isolation. As was noted by the Second Circuit in *United States v. Price*, 599 F.2d 494, 502 (2nd Cir. 1979): "[ i]t must be rare indeed, that an officer observes behavior consistent only with guilt, and incapable of any innocent interpretation." *See also*, *United States v. Gooding*, 695 F.2d 78, (4th Cir. 1982) ( courts should take into account trained law enforcement officers may be able to perceive and articulate conduct which would be wholly innocent to the untrained observer); *United States v. Lender*, 985 F.2d 151 (4th Cir. 1993) (courts have ability to credit practical experience of officers who observe on a daily basis what transpires on the street); *Illinois v. Gates*, 462 U.S. 213, n. 13 (1983) (innocent behavior frequently will provide the basis for a showing of probable cause).

The Supreme Court in *Terry* held that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior, even though there is no probable cause to make an arrest. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to

simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). *See also*, *United States v. Moore*, 817 F.2d 1105 (4th Cir. 1987) (brief investigative stop is permissible whenever police officer has reasonable suspicion grounded in specific and articulable facts that person he stopped has been or is about to be involved in a crime); *United States v. Perrin*, 45 F.3d 869 (4th Cir. 1995) (level of suspicion required to justify search under *Terry v. Ohio*, need not rise to level of probable cause to survive scrutiny under the Fourth Amendment).

    *3. Length of Detention*

In determining whether the length of a detention is reasonable, courts may consider whether police officers were acting in a "swiftly developing situation" and whether they "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). *See also*, *Alpert*, 816 F.2d at 963; *United States v. Carter*, 139 F.3d 424, 433 (4th Cir. 1998). Shortly after returning to his patrol vehicle TFC Decker began running a registration and a record check. Based on the time stamps on Government Exhibit 1, the chronology appears as follows:

    7:48 pm-initial stop of Defendant's vehicle;

    7:52 pm-request made for MVA record check on Defendant;

    8:00 pm-request for criminal history check on Defendant;

    8:12 pm- request for MVA check in Virginia on Defendant;

    8:19 pm-follow up request for MVA check in Virginia

    8:23 pm- Defendant is given warning ticket told free to go.

    8:23 pm-Defendant gives consent to search vehicle

      8:25 pm- Hidden Compartment discovered-Defendant detained.

      8:55 pm -6 kilograms of cocaine recovered from inside hidden compartment and Defendant arrested.

Thus from the time of the initial stop, until the Defendant was given his warning ticket and told he was free to go,[6] 35 minutes had elapsed. It was also at this point that the Defendant told TFC Decker he could search the vehicle, having previously told TFC Gussoni that he was "in no rush" and they could search his vehicle if the troopers wanted.

The Defendant in his motion argues that "[A]fter over 20 minutes of stalling" the Defendant was issued a warning ticket. Defendant's motion at 1. The Supreme Court in *Sharpe*, 470 U.S. at 683 held that a twenty-minute detention of a driver reasonably suspected of transporting marijuana in a truck meets the Fourth Amendment's standard of reasonableness for investigative stops. The Court rejected adoption of a *per se* rigid time limitation on *Terry* stops, and instead emphasized the need to consider the purpose underlying such a stop – i.e. investigating possible criminal activity. *Id*. at 685. The Court cited its earlier decision in *Michigan v. Summers*, 452 U.S. 692, 700 (1981), for the proposition that if this purpose is to be served: "[T]he police must under certain circumstances be able to detain the individual for longer than the brief time period involved in Terry." *Id*. at 685-686.

The Fourth Circuit has found that similar detentions are reasonable in length. *See e.g. United States v. Poole*, 718 F.2d 671 (4th Cir. 1983) (stop of vehicle for "several minutes" did not transform stop into an illegal arrest); *Alpert*, 816 F.2d at 964 (detention of airline passenger's

---

[6] While the video makes clear the officers were not inclined to let the Defendant leave, that fact was <u>never</u> communicated to the Defendant. Nor, by any action of the troopers did they suggest the Defendant was <u>not</u> free to leave.

briefcase for 50 minutes in order to subject it to canine sniff was not unreasonable where officers acted diligently); *United States v. McFarley*, 991 F.2d 1188, 1193-1194 (4th Cir. 1993) (a 38-minute delay after the stop, which was used to subject luggage to a sniff, was not longer than is necessary for diligent police officers to pursue their investigation, and therefore did not elevate an investigatory stop to a full-blown arrest). *See also*, *United States v. White*, 42 F.3d 457 (8th Cir. 1994) (delay of one hour and twenty minutes for the arrival of drug dogs was not unreasonable); *United States v. Villa-Chaparro*, 115 F.3d 797, 803-803 (10th Cir. 1997) (an extended detention of nearly 40 minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment).

Here, from the time of the initial stop at 7:48 pm, until the Defendant was given his warning ticket at 8:23 pm, a total of 35 minutes elapsed. During this time, TFC Decker made repeated requests for both MVA and criminal record checks for the Defendant. In attempting to write the warning ticket, TFC Decker also had a concern about whether the vehicle had valid insurance and whether it had been stolen. In determining whether the length of a detention was reasonable, courts consider whether police officers were acting in a "swiftly developing situation" and whether they "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," *Sharpe*, 470 U.S. at 686; *Alpert*, 816 F.2d at 963; *United States v. Carter*, 139 F.3d 424, 433 (4th Cir. 1998).

    4.  *The Defendant Consented To A Search Of The Vehicle.*

As is reflected on Government Exhibit 1, the Defendant consented to a search of his vehicle. The Defendant argues that his consent was: (a) "[t]ainted by the illegal duration of the traffic stop;" and (b) " [T]he Defendant did not voluntarily consent to search of the interior of the automobile vehicle" (sic). Defendant's motion at 1-2.

The Fourth Amendment prohibits unreasonable searches and searches conducted without a warrant are per se unreasonable unless a valid exception to the warrant requirement is applicable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Voluntary consent to a search is such an exception. *Id. See also, United States v. Latimore*, 87 F.3d 647, 650 (4th Cir. 1996). In determining whether consent to search was freely and voluntarily given, it is a question of fact to be determined from the totality of the circumstances. *Schneckloth* 412 U.S. at 227.

As discussed *infra* at 7-9, the length of traffic stop was no longer than necessary in order for TFC Decker to determine the driving status and criminal history of the Defendant. Furthermore, the Defendant told both TFC Decker and TFC Gussoni he was not in a rush and they could take as long as they wanted to determine not only his status but to also confirm that the vehicle was not stolen. Within two minutes of the troopers beginning their search of the vehicle, they discovered the hidden compartment, at which time the Defendant was detained until the search could be completed by opening the hidden compartment.

As to the Defendant's claim that he did not voluntarily consent to a search of the interior of the vehicle, his statements and conduct, as demonstrated on Government Exhibit 1, belie that argument. TFC Decker asked the Defendant for permission to search the vehicle and the Defendant consented. At no time did the Defendant limit or restrict what portion or area of the vehicle the troopers could search. Nor did he ever withdraw his consent. The troopers told the Defendant that they were concerned that the vehicle may have been stolen and wanted to look for signs of theft or tampering. The Defendant consented to their searching the vehicle and did not restrict what area or portion of the vehicle the troopers could search. In *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) the Supreme Court held that a general consent to a search of an automobile authorized not only a

10

search of the interior of the automobile but a search of any container within the vehicle that could contain contraband. In looking inside the vehicle TFC Gussoni discovered the hidden compartment. Based on his training, knowledge and experience, TFC Gussoni knew that hidden compartments of this type are used to conceal narcotics, guns and money. The discovery of the hidden compartment coupled with other indica, e.g the multiple air fresheners, the Defendant's nervousness, his statements about borrowing the vehicle from a friend whose full name he did not know, the single key in the ignition, the lack of luggage for a trip that the Defendant said would be one to two days, certainly gave the troopers not only reasonable suspicion but probable cause to detain the Defendant until the contents of the hidden compartment could be determined. Because the Defendant voluntarily consented to a search of his vehicle the six kilograms of cocaine discovered as a result of the search are admissible as evidence against the Defendant.

## IV. CONCLUSION.

For all of the above reasons, the Government respectfully requests that the Defendant's motion to suppress physical evidence be denied.

Respectfully submitted,

ROD J. ROSENSTEIN
United States Attorney

By: _____/s/_____
Christopher J. Romano
Assistant United States Attorney
36 S. Charles St., 4th Fl.
Baltimore, Maryland 21201
(410)209-4907

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this  5th  day of March, 2010, I caused a copy of the foregoing Government's Response to Defendant's Motion To Suppress Physical Evidence be both mailed to and electronically filed with:

Christie P. Needleman, Esquire
1005 N. Calvert St.
Baltimore, MD 21202-3823

_____/s/_____
Christopher J. Romano
Assistant United States Attorney