# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | Criminal No. JFM-09-00452 |
| **LENNY ORTIZ,** | : | |
| | : | |
| **Defendant** | | |
| | : | |

...o0o...

### GOVERNMENT'S SUPPLEMENTAL RESPONSE
### TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

Now comes the United States of America by its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland and Christopher J. Romano, Assistant United States Attorney and responds in opposition to the Defendant's motion to suppress physical evidence.

**I.      FACTUAL AND PROCEDURAL SUMMARY OF THE CASE**

On August 18, 2009, a federal grand jury returned a two count indictment against Lenny Ortiz (Defendant), charging him in Count One with conspiracy to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. §846 and in Count Two with possession with the intent to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. §841(a)(1).

On September 25, 2009, the Defendant was arraigned and pled not guilty to both charges. On February 23, 2010, the Defendant filed a motion to suppress the physical evidence seized from the vehicle he was operating on August 7, 2009.

On September 2, 2010, a motions hearing was held. At the conclusion of the hearing, the

district court asked the parties to file supplemental memoranda addressing: (1) the period of time from the initial car stop, until Trooper (TFC) Decker issued the warning ticket; (2) the fact that TFC Decker told the Defendant he was free to leave; and (3) confirmation that there was a "look out" from law enforcement authorities in New Jersey for the vehicle the Defendant was operating.

Subsequent to the issues raised/set forth above, on September 21, 2010, the district court, by letter dated September 21, 2010, clarified the issues under consideration stating that (1) the length of detention was reasonable based on (a) the Defendant's statements to the troopers that his license may have been suspended in Virginia[1], (b) the uncertainty as to ownership of the vehicle; (2) any deception by the troopers in telling the Defendant he was free to go did not invalidate the search; (3) the consent search in terms of whether the initial consent given by the Defendant was as a matter of constitutional law vitiated by TFC Decker's advising the Defendant he was free to leave, as well as whether the consent given by the Defendant to TFC Gussoni was not pursuant to Maryland State Police policy, and therefore only the consent given to TFC Decker controlled; (4) whether the search exceeded the consent given by the Defendant; (5) whether the search was justified independent of consent as a result of probable cause including (a) the "lookout", (b) the multiple air fresheners and overwhelming odor of air fresheners, (c) the Defendant's limited knowledge about the owner of the vehicle, and (d) the Defendant's apparent confusion about his destination; and (6) the "lookout" and its reliability.

---

[1] It is the Government's recollection that the Defendant informed TFC Gussoni that his license may have been suspended in Virginia. TFC Gussoni then informed TFC Decker of this information, which resulted in TFC Decker running a record check in Virginia.

## II. <u>EVIDENCE AND TESTIMONY ELICITED AT THE MOTIONS HEARING</u>

At the motions hearing on September 2, 2010, the Government called two witnesses, TFC Decker and TFC Gussoni. In addition, the Government introduced the video tape of the car stop of the vehicle the Defendant was operating, as well as introduced into evidence the Defendant's driver's license, the vehicle registration, and insurance documents furnished by the Defendant.

According to testimony by TFC Decker on August 7, 2008, at approximately 7:48 pm, he was on patrol southbound on I-95 in Baltimore County, when he observed a white Mitsubishi SUV bearing NJ registration YSY 95E, traveling above the posted speed limit in a construction zone. The speed limit in the area was 55 mph and TFC Decker observed the vehicle traveling at a rate of 65 mph. There were two posted construction signs prior to Exit-67 advising of the 55 mph posted speed.

After following the vehicle for approximately one quarter mile, TFC Decker initiated a traffic stop on the vehicle. Upon approaching the vehicle, TFC Decker immediately detected an overbearing scent of air fresheners coming from within the vehicle. TFC Decker observed multiple air fresheners next to the driver, one hanging from the rear window, another hanging from the rear view mirror, and two unopened air fresheners in the glove box[2]. TFC Decker informed the Defendant, who was the sole occupant of the vehicle, of the reason for making the traffic stop. In speaking with the Defendant, the Defendant told TFC Decker that he knew he was speeding but stated he saw TFC Decker behind him and he didn't want to slam on his brakes.

TFC Decker then asked the Defendant about his destination, and the Defendant advised TFC

---

[2] TFC Decker observed the air fresheners in the glove box when the Defendant opened the glove box.

3

Decker he was going to meet a friend at a diner/restaurant off Exit-59 or Exit-60, but was uncertain of the location. The Defendant produced his New York driver's license, but when TFC Decker asked him for the owner's information for the vehicle, which was displaying New Jersey tags, the Defendant stumbled over the owner's name, stating that he only knew the last name, which was Sanchez. The Defendant told TFC Decker that the owner (Sanchez) was a friend of his and he borrows the vehicle often.

TFC Decker returned to his vehicle and began to run a MVA check on the Defendant's license status. TFC Decker also requested a criminal history check on the Defendant.

While TFC Decker was preparing to write a warning ticket for the Defendant, TFC Decker was joined by another trooper, TFC Gussoni. TFC Gussoni spoke with the Defendant. In speaking with TFC Gussoni, the Defendant stated he may be suspended in Virginia. TFC Gussoni informed TFC Decker of this and TFC Decker then requested a license check in Virginia for the Defendant as well. The Defendant also told TFC Gussoni that he was in no hurry and the troopers could search the vehicle if they wanted.

The evidence established that the Defendant initially produced an insurance card for the vehicle which reflected that the insurance had expired. Subsequently, he produced documentation of valid insurance. TFC Decker and TFC Gussoni testified they were concerned that the vehicle may be stolen, as the Defendant could not provide information on the owner of the vehicle.

Ultimately, the Defendant was given a warning ticket by TFC Decker for exceeding the posted speed. TFC Decker and TFC Gussoni discussed between them that they were not going to let the Defendant leave. According to testimony from the troopers, the Defendant was never told that he would be detained. In fact, he was told he was free to go and TFC Decker returned to the

Defendant his license, the vehicle registration and insurance information, as well as the warning ticket. It was <u>after</u> handing the warning ticket, the Defendant's driver's license, vehicle registration and insurance information back to the Defendant, that TFC Decker told the Defendant he was still concerned that the vehicle might be stolen and asked the Defendant to consent to a search for signs of tampering/theft. The Defendant then gave consent. As the video confirms TFC Decker and Gussoni then began a search of the vehicle and approximately two minutes later they discovered a hidden compartment ("trap") inside the vehicle. Upon discovering the trap, the Defendant was handcuffed and questioned about the hidden compartment and denied any knowledge of it. It took several more minutes for the officers to open the trap, which was done by the use of cable wires and the vehicle's battery. Once the trap was opened six (6) kilograms of cocaine were discovered inside the hidden compartment. The Defendant was then placed under arrest.

**III.    ARGUMENT**:

   *1.    The Initial Stop.*

As set forth *supra*, TFC Decker had a valid basis to stop the vehicle, independent of the "lookout". A decision to stop an automobile is reasonable where a police officer has probable cause to believe a traffic violation has occurred, regardless of how minor the traffic offense may be. *Whren v. United States*, 517 U.S. 806, 810 (1996); *Delaware v. Prouse*, 440 U.S. 648, 659 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). *See also, Rusher*, 966 F.2d at 875-76 (state trooper's stop of automobile for two traffic violations, failure to wear seatbelt and faulty license plate, was proper); *United States v. Jeffus*, 22 F.3d 554 (4th Cir. 1994) (police officer's stop of vehicle with cracked windshield, broken taillight and headlight was justified); *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996) (state trooper's stop of vehicle with cracked windshield and

5

traveling six miles over posted speed limit was valid). TFC Decker testified that he paced the car being driven by the Defendant and observed it to be exceeding the posted speed of 55 mph. While the Defendant's counsel questioned TFC Decker about the calibration of his speedometer, the size and location of the posted signs indicating the 55mph zone, there is no real or credible argument that the Defendant was not speeding. Indeed, the Defendant advised TFC Gussoni, according to the video tape at 20:15 hours that the Defendant thought he was driving at a speed of 80 mph. He also informed TFC Decker he knew he was speeding but did not want to slam on his brakes for fear of causing an accident. Therefore, the vehicle's excessive speed provided a legitimate basis for the stop.

  *2. Subsequent Detention/Investigatory Stop.*

In *United States v. Brugal*, 209 F.3d 353, (4th Cir. 2000) the Fourth Circuit held that the *Terry*[3] reasonable suspicion standard requires an officer to have a reasonable suspicion that criminal activity is afoot before he may conduct a brief investigatory stop of a person or to continue to seize a person following the conclusion of the purposes of a valid stop. TFC Decker had a reasonable suspicion for the continuation of the stop and for the questioning of the Defendant based on various factors. First, the vehicle operated by the Defendant was registered to an individual that the Defendant claimed was a friend, but did not know her name, other than her last name, even though he claimed to have borrowed the vehicle all the time. Video tape at 19:50, 19:57-59, 20:14. Second, the Defendant's claim that he was married but going to see a girlfriend for a few day, but was uncertain as to where he was going. Video tape at 19:57-59. Third, there were multiple air

---

[3] *Terry v. Ohio,* 392 U.S. 1 (1968)

fresheners[4] throughout the vehicle.  Video tape at 19:50, 19:57-59.  Fourth, the Defendant was extremely nervous[5], in his encounter with both TFC Decker and TFC Gussoni.  Video tape at 19:57-59, 20:11, 20:13.  On the video tape, TFC Gussoni can be heard telling TFC Decker that when he asked the Defendant about any large amounts of money in the vehicle, the Defendant was extremely nervous and looked down.  Video tape at 20:14.  At the motions hearing TFC Gussoni testified that not only did he ask the Defendant about whether there were any large amounts of money in the car, but also whether there were any drugs in the car, including heroin and cocaine.  According to TFC Gussoni's testimony not only did the Defendant deny there were any drugs in the car, but he told TFC Gussoni that the troopers could search the car, as he was in no rush.  Video tape at 20:13.  Fifth, the Defendant's cell phone was "ringing off the hook", and it appeared to the troopers he was on the cell phone the entire time.  Video tape at 20:14.  Yet, when TFC Gussoni and TFC Decker attempted to obtain a phone number for the owner of the vehicle, in an effort to confirm ownership, the Defendant was unable to provide a telephone number for her.  Video tape at 20:14.

In assessing whether an officer has a reasonable suspicion of criminal activity, the totality of the circumstances should be considered.  *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir.

---

[4] Air fresheners are commonly used to mask the smell of narcotics.  *United States v. Foreman*, 369 F.3d 776, 784-785 (4th Cir. 2004);*United States v. Foley*, 206 F.3d 802, 804, 806 (8th Cir. 2000).

[5] Both the Supreme Court in *United States v. Sokolow*, 490 U.S. 1 (1989) and *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) as well as the Fourth Circuit in *United States v. Alpert*, 816 F.2d 958, 961 (4th Cir. 1987) have held that reasonable suspicion that criminal activity may be afoot can be based on a number of factors including being nervous when addressed by a police officer.  *See also, United States v. McFarley*, 991 F.2d 1188,  (4th Cir. 1993) (police had reasonable suspicion to justify further questioning where defendant and companion passenger appeared unusually nervous and companion found it necessary to "check" with defendant before answering questions).

1997). Also, as noted in *Sokolow,* "[r]easonable suspicion is a commonsensical proposition," *Sokolow*, 490 U.S. at 9-10 (*quoting Terry*, 392 U.S. at 22) and courts are "not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the streets." *Id*. As such, reviewing courts should consider all of the facts available to the officers who made the stop, and should permit the officers to draw on their experience and training to make inferences and deductions about the "cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 544 U.S. 266, 273-74 (2002).

The Supreme Court in *Terry* held that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior, even though there is no probable cause to make an arrest. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). *See also*, *United States v. Moore*, 817 F.2d 1105 (4th Cir. 1987) (brief investigative stop is permissible whenever police officer has reasonable suspicion grounded in specific and articulable facts that person he stopped has been or is about to be involved in a crime); *United States v. Perrin*, 45 F.3d 869 (4th Cir. 1995) (level of suspicion required to justify search under *Terry v. Ohio*, need not rise to level of probable cause to survive scrutiny under the Fourth Amendment).

*3. Length of Detention*

The district court in its letter of September 21, 2010, has correctly determined that the length of the traffic stop was reasonable, particularly in light of the Defendant stating he may be suspended in Virginia, his uncertainty as to the owner, and the troopers concern that the vehicle may be stolen.

In determining whether the length of a detention is reasonable, courts may consider whether police officers were acting in a "swiftly developing situation" and whether they "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). *See also*, *Alpert*, 816 F.2d at 963; *United States v. Carter*, 139 F.3d 424, 433 (4th Cir. 1998). Shortly after returning to his patrol vehicle TFC Decker began running a registration and a record check. Based on the time stamps on the video, the chronology as to not only the record check, but other matters appear as follows:

    19:48-TFC Decker makes initial stop of the vehicle;

    19:52-TFC Decker requests a MVA record check on Defendant;

    20:00-TFC Decker requests a criminal history check on Defendant;

    20:07- TFC Decker receives information from dispatch that there are no caution codes;

    20:10-TFC Decker heard stating he needs to grab more information for the traffic stop;

    20:11- Defendant tells TFC Gussoni he may be suspended in Virginia;

    20:13-TFC Decker requests a MVA check in Virginia on Defendant;

    20:13-Defendant tells TFC Gussoni he is in no rush and gives consent to search the vehicle;

    20:14-TFC Gussoni unsuccessfully tries to get phone number for owner;

    20:15- Defendant provides what appears to be expired insurance for vehicle;[6]

    20:16-TFC Decker obtains Defendant's full name (including middle name);

    20:18-TFC Decker confirms current on insurance, but questions validity of document;

    20:19-TFC Decker reruns Defendant's motor vehicle status in Virginia with full name;

---

[6] TFC Decker testified at the motions hearing that if there was no valid insurance on the vehicle it would have to be towed.

    20:23-Defendant is given warning ticket, as well as driver's license, registration and insurance documents;

    20:23-Defendant gives consent to search vehicle;

    20:24-Defendant can be heard saying he has "no problem" with search of vehicle;

    20:24-Search of vehicle by TFCs Decker and Gussoni;

    20:25 Trap/Hidden compartment discovered.

Thus from the time of the initial stop, until the Defendant was given his warning ticket and told he was free to go,[7] a total of 35 minutes had elapsed.

The Fourth Circuit in *United States v. Branch*, 537 F.3d 328, 339 (4th Cir. 2008) upheld the district court's (Judge Catherine C. Blake) determination that a 30 minute detention was constitutional. "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." *Id*. at 336. The facts in *Branch* are similar to those here. Branch was stopped for a traffic violation. The officer noticed several air fresheners in the vehicle and the officer observed Branch to be nervous, as his hand was "shaking" and he would not make eye contact with the officer. In addition, the vehicle was not registered to Branch, and the officer had difficulty confirming that Branch was authorized to have the vehicle. Branch was asked for a phone number for the owner, but could not provide one, claiming she was in the Bahamas. The officer eventually obtained a phone number for the owner, who confirmed that Branch was authorized to drive the vehicle. Of course, there was no confirmation here that the Defendant was

---

[7] While the video makes clear the officers were not inclined to let the Defendant leave, that fact was never communicated to the Defendant. Nor, by any action of the troopers did they suggest the Defendant that he was not free to leave.

10

authorized to drive the vehicle.[8] Branch argued, much as the Defendant does here, that the officer unnecessarily and unconstitutionally prolonged the traffic stop. In rejecting that argument, the Fourth Circuit upheld Judge Blake's determination that the 30 minute delay was appropriate by the "basic fact that much of Branch's 30 minute detention was justified by 'ordinary inquiries' incident to a traffic stop." *Branch*, 537 F.3d at 328, citing *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). Indeed, the delay in issuing the warning ticket here was occasioned by the Defendant's inability to furnish information about the registered owner of the vehicle, providing what initially appeared to be expired insurance, as well as telling the troopers that he may be suspended in Virginia. Any delay in issuing the warning was the direct result of the Defendant's actions and statements.

    4.    *Any Deception By The Police Did Not Vitiate The Consent To Search Or Violate The Defendant's Constitutional Rights.*

At the motions hearing the Court expressed concern that the troopers had lied to the Defendant by telling him he was free to leave. The Government argued that courts have long held that deception is a valid weapon in the police arsenal. *See* e.g. *Oregon v. Mathiason*, 429 U.S. 492, 495-496 (1977) (officer falsely telling suspect that suspect's fingerprints had been found at crime scene did not render interview "custodial under Miranda); *Frazier v. Cupp*, 394 U.S. 731, 739 (fact that police falsely told defendant that defendant's companion had confessed was insufficient to make otherwise voluntary confession by defendant inadmissible). Here, the Defendant was told he was free to leave, even though the troopers stated intention to each other was otherwise. There is absolutely no evidence that the Defendant knew of the troopers deception, nor that his consent was in any way involuntary or coerced. Indeed, prior to even being informed he was free to go, the

---

[8] Thus, the Government made its lack of standing objection, which, while recognizing the Court's ruling, nevertheless does not abandon its contention that the Defendant has failed to prove standing as to the vehicle.

Defendant had informed TFC Gussoni, in response to whether he had any money or drugs in the vehicle, that the troopers could search the vehicle. The evidence and state of the record is uncontroverted in this regard. It also cannot go unnoted that after the Government concluded the presentation of its case, the court inquired of the defense if they intended to offer any evidence. They declined to do so. Thus, there is absolutely no evidence that any deception by the police regarding the Defendant being told he was free to leave in any way mislead or overbore the Defendant's free will. While the court expressed concern about further actions by troopers if they then attempted to detain an individual after being told he was free to go, and the potential for a civil action under 42 U.S.C. §1983, that is not the case here, or a basis on which to hold the Defendant's constitutional rights were violated. And while the court has also suggested that the bringing of such an action may be an "excessive inducement" for the troopers to perjure themselves by denying that they had told the detainee that he was free to leave, the "tale of the tape" here, or for that matter in any car stop by the Maryland State Police in a vehicle equipped with a video camera, it would belie such an occurrence. Finally, as the court may recall during the motions hearing it opined that it believed TFC Decker was being both truthful and credible in describing his encounter with the Defendant.

     5.    *The Defendant Consented To A Search Of The Vehicle.*

At the motions hearing, the testimony of both TFC Gussoni and TFC Decker, as well as the video tape established that the Defendant consented to a search of the vehicle. In fact his consent, like Portia's mercy was "twice blessed."[9]

TFC Gussoni testified that in speaking with the Defendant he asked the Defendant if there

---

[9] Shakespeare's *Merchant of Venice*.

was any heroin, cocaine, marijuana or large amounts of money in the vehicle. The Defendant told the trooper "no." TFC Gussoni testified that the Defendant told the trooper he was free to search the vehicle. TFC Gussoni's testimony is corroborated by the video tape at 20:13, where TFC Gussoni tells TFC Decker that the Defendant, while extremely nervous when asked about whether there were large amounts of currency in the car looked down, said "no," and told TFC Gussoni that he was free to search the vehicle, as the Defendant was in no rush. The Supreme Court in *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) held that a narcotics suspect's Fourth Amendment right to be free from unreasonable searches was not violated when, after he gave police permission to search, and had not placed any explicit limitation on the scope of the search, the police found cocaine concealed inside a folded paper bag on the car's floorboard. "A suspect may of course delimit as he chooses the scope of the search to which he consents." *Id*. at 252. But that did not occur here. At <u>no</u> time after he gave consent to TFC Gussoni did the Defendant revoke or limit his consent. While the court in its letter states that the consent given by the Defendant to TFC Gussoini was "as a matter of constitutional law, vitiated by Trooper Decker's subsequent statement to Mr. Ortiz that he was free to leave", Government counsel has found no case law to support that proposition. If anything, when told he was free to leave, the Defendant again gave consent to search his vehicle, stating he had "no problem." Video tape at 20:24.

      Nor was the search, pursuant to the consent given by the Defendant to TFC Gussoni constitutionally prohibited. During the testimony at the motions hearing, the court inquired as to why, if TFC Gussoni had received consent from the Defendant, the troopers needed to ask permission/consent a second time. The troopers testified that because Maryland State Police policy "requires" the troopers to tell the individual he was free to leave, return all paperwork, remove their

hat, etc., they asked for permission a second time. Assuming *arguendo*, that TFC Gussoni did not follow Maryland State Police policy in obtaining consent from the Defendant, the consent was nevertheless freely and voluntarily given. Again, there is nothing in the record to demonstrate otherwise. The fact that the trooper's actions in obtaining the consent were inconsistent with or in contravention of a Maryland State Police protocol does <u>not</u> convey substantive rights on the Defendant. *See United States v. Caceres*, 440 U.S. 741, 744 (1979) (violation of agency of its own regulation does not require suppression of evidence otherwise lawfully obtained); *United States v. Jones*, 13 F3d 100, 103 (4th Cir. 1993) (violation of interagency memorandum not a sound basis for suppressing evidence).

Nor did the search conducted by the troopers exceed the scope of the second consent. Both troopers testified that they had a concern that the vehicle being operated by the Defendant may have been stolen. The Defendant claimed he borrowed the vehicle frequently, but stumbled over the owner's last name and did not know the first name. TFC Gussoni further testified at the motions hearing that the information he had received from a trooper in New Jersey, as set forth in more detail below at pp 15-16, was that the vehicle was associated with the transportation of drugs and money in northern New Jersey and southern New York. TFC Gussoni stated that this information, coupled with the Defendant's inability to provide the name of the owner of the vehicle, his nervousness, and his confusion about where he was to meet his girl friend, gave him concern that the vehicle may have been stolen. He testified that it was not uncommon for a drug dealer/organization to be robbed by another. The court, while expressing skepticism that under the circumstances the vehicle was stolen, incorrectly states that the troopers "initially" pulled out the back seat looking for a secret VIN, before first looking at the visible VIN. When the search was conducted, as is reflected on the

video at 20:24-25, TFC Decker went to the front driver's side of the vehicle, while TFC Gussoni went to the front passenger side of the vehicle. TFC Decker testified that while he was at the front driver's side he looked at the steering wheel, the ignition and for loose wires. While doing so, he can be heard on the video tape talking about the strong odor of the air fresheners. TFC Gussoni, after initially searching the front passenger side, <u>then</u> proceeded to the rear passenger side, where, he lifted the seat looking for a concealed VIN number. The video confirms that the search by the troopers began at the <u>front</u> of the vehicle and it was only after TFC Gussoni had completed his search of that area that he moved to the rear passenger area where the trap was discovered under the seat. The search conducted by the troopers was consistent with their concern that the vehicle may have been stolen.

Finally, even <u>if</u> the court were to find that notwithstanding the troopers' belief that they were conducting a lawful consent search to determine whether the vehicle was stolen was not reasonable, the search was nevertheless conducted lawfully under the earlier consent given to TFC Gussoni by the Defendant. Again, there is no evidence that at any time was the consent: (1) involuntary, (2) limited, or (3) withdrawn.

      6.    *The Lookout.*

Both TFC Decker and TFC Gussoni testified that they had received a lookout that the vehicle being operated by the Defendant was involved in narcotics trafficking. Both troopers testified that the information was received by them from the New Jersey State Police and that there was communication over the CapWin system. At the conclusion of the motions hearing, and again in the Court's letter of September 21, 2010, there were references to supplementing the record with this

information. Attached as Exhibit 1 is an excerpt[10] of the CapWin communications of TFC Decker. Attached as Exhibit 2, is the CapWin logs of TFC Gussoni for the same time period. As is reflected in both exhibits, information was received by both troopers that a "White Mitz. Montero NJ-YSY95E heading SB I-95w/possible CDS n $$$". There also appears a phone number 201-906....That phone number, for which the last four digits have been redacted, is the phone number of New Jersey State Trooper Larry Williams ,who is assigned to investigate narcotics/drug trafficking. Attached as Exhibit 3, is an affidavit from Trooper Williams which confirms the following:

- Trooper Williams had received information from a confidential source that a white Mitsubishi Montero, bearing New Jersey registration YSE95E was being utilized to transport drugs and or money, in connection with a narcotics investigation he was handling.

- The information he had was that the vehicle was usually transporting the drugs and or money in northern New Jersey and southern New York.

- As part of his investigation, Trooper Williams arranged to have what is known as a "silent alert" placed on the tag of the vehicle, so that he could be made aware of its location, if observed by law enforcement.

- On August 7, 2009, Trooper Williams received a contact from another New Jersey trooper, who in the course of running tags on vehicles southbound on the New Jersey Turnpike,

---

[10] Government counsel sought and obtained the CapWin logs for both troopers for the time period of 1900 hours to 2015 hours on August 7, 2009. The car stop occurred at 19:48 hours. The first 8 pages of TFC Decker's logs deal with matters unrelated to the issues at hand, and accordingly have not been furnished, as they are not relevant. Should the court wish to review TFC Decker's logs for this entire time period, the Government is prepared to provide them for an *in camera* review.

16

> observed that the vehicle was southbound, approaching the vicinity of the end of the turnpike in the direction of the Delaware Memorial Bridge.

- This route of travel for the vehicle was unusual based on Trooper Williams' investigation, so he notified the Maryland State Police to be on the lookout for this vehicle. He also advised the Maryland State Police of the information concerning not only that the vehicle was used to transport drugs and/or money, but that its normal location was northern New Jersey and southern New York.

TFC Gussoni testified that not only had he received the lookout but that he spoke with the New Jersey trooper with regard to the vehicle, in particular its use and its normal area of travel.

All of this information provided by Trooper Williams, coupled with the information developed by the troopers on the scene including the multiple air fresheners, the overwhelming odor of the air fresheners, the Defendant's uncertainty about the ownership of the vehicle, uncertainty/confusion about his travel destination, and his nervousness, indeed constitute probable cause which would justify a search of the vehicle had not the Defendant consented.

As the Supreme Court noted in *Illinois v. Gates*, 462 U.S. 213, 233 (1983): "Probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules. Equally important the probable cause standard does not, as the Fourth Circuit noted in *Taylor v. Farmer*, 137 F.3d 117,121-122 (4th Cir. 1993):

> require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

Here, TFC Decker and TFC Gussoni were armed with information that the vehicle that they had stopped for a traffic violation was not only known to be utilized to transport drugs and money,

17

but was registered to the main target of an investigation being conducted by the New Jersey State Police; that it reeked of air fresheners, a common item utilized to mask the detection of narcotics; and it was being operated by an individual who was not only extremely nervous, but was uncertain as to its ownership and the driver's destination.  All of these factors could and did lead the troopers to believe that probable cause existed that the vehicle and its driver were engaged in criminal conduct.

## IV.   CONCLUSION.

For all of  the above reasons, as well as the reasons set forth in the Government's previous response, which is adopted and incorporated herein, the Government respectfully requests that the motion to suppress be denied and the seizure of the six kilograms of cocaine be admitted as evidence in any trial of this matter.

    Respectfully submitted,

    ROD J. ROSENSTEIN
    United States Attorney

By:    _____/s/_____
    Christopher J. Romano
    Assistant United States Attorney
    36 S. Charles St., 4th Fl.
    Baltimore, Maryland 21201
    (410)209-4907

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this __30th__ day of September, 2010, I caused a copy of the foregoing Government's Supplemental Response to Defendant's Motion To Suppress Physical Evidence be electronically filed with the United States District Court and:

Christie P. Needleman, Esquire
1005 N. Calvert St.
Baltimore, MD 21202-3823

Richard Winelander, Esquire
1005 N. Calvert St.
Baltimore, MD 21202

_____/s/_____
Christopher J. Romano
Assistant United States Attorney